**WO**                                                                    SVK

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

Joseph A. Trenton,                  )   No. CV 05-3736-PHX-MHM (DKD)
                                    )
            Plaintiff,              )   **ORDER**
                                    )
vs.                                 )
                                    )
Karen Barcklay, et al.,             )
                                    )
            Defendants.             )
                                    )
_____)

        Plaintiff Joseph A. Trenton filed this civil rights action under 42 U.S.C. § 1983 against
Karen Barcklay and Susan Buffington, employees of the Arizona Department of Corrections
(ADC), alleging deliberate indifference to serious medical needs.  (Doc. #24.)  Defendants
move for summary judgment.  (Doc. #91.)  The motion is fully briefed.  (Doc. ##95, 97.)
        The Court will grant the motion.

**I.      Background and Summary of Motions**

        In his Amended Complaint, Plaintiff alleged that Barcklay was deliberately indifferent
to Plaintiff's medical needs regarding his weak ankles and several ankle injuries he suffered
in 2005.  Plaintiff also alleged that Buffington was deliberately indifferent when she treated
Plaintiff for what he described as stroke-like symptoms that were actually the result of
Ramsey Hunt Syndrome.  (Doc. #24.)

        Defendants move for summary judgment on the grounds that (1) they were not
deliberately indifferent to Plaintiff's medical needs and (2) they are entitled to qualified
immunity.  They also ask the Court to dismiss Plaintiff's claims for monetary relief against

Defendants in their official capacity.

In their reply, Defendants move to strike Plaintiff's response because it is untimely and because the Statement of Material Disputed Facts does not comply with Federal Rule of Civil Procedure 56 or Local Rule of Civil Procedure 56.1. (Doc. #97.)  Plaintiff moves to strike the reply. (Doc. #98.)  Defendants argue that Plaintiff filed his response more than a week after the filing deadline and that by filing an undated certification, he sought to mislead the Court into believing that he had complied with the filing deadline. (Doc. #97 at 3.)  They argue that this prejudiced them by creating a record that appears to require Defendants reply a week earlier than it was due. (Id.)  The Court finds that there is no evidence that Plaintiff intended to deceive the Court but warns Plaintiff that he is responsible for filing a certificate of service that includes the date of service.  The Court will treat the response as timely.

Defendants also argue that the response relies "largely on [Plaintiff's] unfounded Declaration and a pile of disconnected documents. . . ." (Id. at 4.)  Plaintiff submits a Statement of Disputed Facts, a Memorandum with citations to the record, and his Declaration.  Several paragraphs in the Statement of Disputed Facts refer to specific facts disputed by Plaintiff and cite to paragraphs in Plaintiff's Declaration in support.  The Court will consider the facts asserted in Plaintiff's Memorandum and Statement of Facts if they are specific and refer to and are supported by admissible evidence.  The Court will treat Plaintiff's Declaration like an affidavit and consider those statements made on personal knowledge that show Plaintiff is competent to testify to the matters stated.  Fed. R. Civ. P. 56(e).  Plaintiff has also attached nearly 200 pages of exhibits to his response.  The Court will consider the exhibits only if they are specifically referenced in the response or Plaintiff's Declaration.  "Judges need not paw over the files without assistance from the parties."  Orr v. Bank of America, 285 F.3d 764, 775 (9th Cir. 2002) (quoting Huey v. UPS, Inc., 165 F.3d 1084, 1085 (7th Cir. 1999).  The Court will deny Plaintiff's motion to strike the reply. LRCiv 7.2(m)(1).

**II.    Legal Standards**

### A.     Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The party against whom a summary judgment motion is directed need not file any contravening affidavits or materials but is entitled to denial of summary judgment where the moving papers are insufficient or on their face demonstrate the existence of a material issue of fact. Henry v. Gill Industries, 983 F.2d 943, 949 (9th Cir. 1994).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party who must demonstrate the existence of a factual dispute the fact in contention must be material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute must be genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set forth specific facts showing that there is a genuine issue for trial" and not to "rest upon the mere allegations or denials of [the party's] pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. Celotex, 477

1  U.S. at 322-23.

2      When considering a summary judgment motion, the court examines the pleadings,
3  depositions, answers to interrogatories, and admissions on file, together with the affidavits,
4  if any.  Fed. R. Civ. P. 56(c).  The evidence of the non-movant is "to be believed, and all
5  justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.  But, if the
6  evidence of the non-moving party is merely colorable or is not significantly probative,
7  summary judgment may be granted.  Id. at 249.

8      **B.    Medical Claim**

9      To prevail on a claim under the Eighth Amendment for prison medical care, a prisoner
10  must demonstrate "deliberate indifference to serious medical needs."  Jett v. Penner, 439 F.3d
11  1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).  A plaintiff
12  must show (1) a "serious medical need" by demonstrating that failure to treat the condition
13  could result in further significant injury or the unnecessary and wanton infliction of pain and
14  (2) the defendant's response was deliberately indifferent.  Jett, 439 F.3d at 1096 (citations
15  omitted).  To act with deliberate indifference, a prison official must both know of and
16  disregard an excessive risk to inmate health; the official must both be aware of facts from
17  which the inference could be drawn that a substantial risk of serious harm exists, and he must
18  also draw the inference.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  Deliberate
19  indifference in the medical context may be shown by a purposeful act or failure to respond
20  to a prisoner's pain or possible medical need and harm caused by the indifference.  Jett, 439
21  F.3d at 1096.

22      But mere claims of "indifference," "negligence," or "medical malpractice" do not
23  support a claim under § 1983.  Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.
24  1980).  Inadequate treatment due to malpractice or even gross negligence does not constitute
25  an Eighth Amendment violation.  Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir.
26  1990).  Medical malpractice does not become a constitutional violation merely because the
27  victim is a prisoner.  Moreover, differences in judgment between an inmate and prison
28  medical personnel regarding an appropriate medical diagnosis or treatment are not enough

to establish a deliberate-indifference claim.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

**III.    Motion for Summary Judgment**

      **A.    Barcklay**

      **1.    Defendants' Contentions**

In support of the motion, Barcklay submits her Affidavit and numerous medical records.  (Doc. #92, Ex. A, Barcklay-Dodson Aff., Attach. 1)   She is a Physician II at the Arizona State Prison Complex-Yuma and a medical doctor licensed in Arizona.  (Barcklay-Dodson Aff. ¶¶ 1-2.)  On December 14, 2005, Defendant saw Plaintiff and assessed that he had ringworm and flat feet.  (Doc. #92, Defs. Statement of Facts (DSOF) ¶ 12; Barcklay-Dodson Aff. ¶ 6.)   She prepared a Special Needs Order (SNO) for December 15, 2004 through December 15, 2006 for arch supports.  (Id.)  Thereafter, Plaintiff requested a male provider and was seen by Dr. Sheetz for foot pain.  (DSOF ¶ 13, Barcklay-Dodson Aff. ¶ 7.) Dr. Sheetz's noted a normal range of motion and ordered x-rays for the right foot and ankle. (Id.)   Review of the x-rays by Dr. Weiss showed a normal right foot and ankle and no evidence of fracture, dislocation, soft tissue calcifications, or destructive lesions.  (DSOF ¶ 14, Barcklay-Dodson Aff. ¶ 8.)

On February 14, 2005, Plaintiff reported a recreational injury to his right ankle; Plaintiff was seen that day by a nurse.  (DSOF ¶ 15, Barcklay-Dodson Aff. ¶ 10.)  The nurse observed that Plaintiff had zero range of motion, the ankle was bent, and Plaintiff could wiggle his toes and had good circulation.  (Id.) The nurse assessed that Plaintiff could have a fracture or dislocation; she contacted the physician on duty, Dr. Sheetz, who directed that Plaintiff be sent for an x-ray.  (Id.)  Plaintiff refused to go to the ER.  (Id.)  Nursing provided a SNO for non-duty status and three-times-daily medical ice for three days.  (Id.)  The ankle was x-rayed the next day per the order of Dr. Sheetz.  (Id.)  Dr. Weiss read the x-ray and noted no fracture or dislocation.  (DSOF ¶ 16, Barcklay-Dodson Aff. ¶ 11.)

Plaintiff submitted a Health Needs Request (HNR) on February 16, 2005, complaining that he had only been given a wrap bandage and a bottle of 200 mg acetaminophen, and that

his ankle was swollen and painful, he was having difficulty walking, and he needed an MRI. (DSOF ¶ 17, Barcklay-Dodson Aff. ¶ 12.)  Defendant saw Plaintiff on February 17th, and Plaintiff reported that he had injured his ankle on the basketball court.  (DSOF ¶ 18, Barcklay-Dodson Aff. ¶ 13.)  Plaintiff reported that the ankle was sore but felt better with pressure.  (Id.)  Defendant noted "no distress" and observed that Plaintiff was not using the ace bandage and walked with a slight limp.  (Id.)  Defendant also noted swelling and eochymosis on the lateral side and tenderness at the ligament area.  (Id.)  Defendant discussed the findings of no fracture and assessed that Plaintiff had sprained his ankle.  (Id.)  Defendant advised Plaintiff of the reason for using the ace bandage and also on range-of-motion exercises. (Id.)  Defendant prescribed 600 mg ibuprofen four times daily and further advised Plaintiff that it could take 8 to 12 weeks for the sprain to heal.  (Id.)  A follow-up appointment was scheduled for two weeks later, on March 3, 2008.  (Id.)

Plaintiff's medical record notes that on February 20th, Licensed Practical Nurse ("LPN") Bottle was contacted because of Plaintiff's complaints of pain; she noted that Plaintiff was wearing the bandage and had difficulty bearing weight on his right foot. (DSOF ¶ 20, Barcklay-Dodson Aff. ¶ 15.)  She ordered medical ice for three days and issued crutches and a Special Needs Order ("SNO") to limit Plaintiff's activities.  (Id.)  She advised Plaintiff to use the crutches, to elevate his foot, and to attend the nurses' line for evaluation. (Id.)

On February 27th, Nurse Bottle was notified that Plaintiff had twisted his left ankle in the shower.  (DSOF ¶ 21, Barcklay-Dodson Aff. ¶ 16.)  She examined Plaintiff's left ankle and found a pronounced limp and edema.  (Id.)  She applied an ace wrap and ordered medical ice three- times-daily for three days, 200 mg ibuprofen every six hours, and a Special Needs Order  ("SNO") limiting activities.  (Id.)  Plaintiff submitted an HNR on February 28th requesting a MRI for both ankles. (DSOF ¶ 19, Barcklay-Dodson Aff. ¶ 14.)  It was routed to Defendant who determined that no MRI would be done on the ankles because a medical provider could assess the extent of soft tissue damage by examination.  (Id.)  Plaintiff was seen for a follow-up on March 3rd by LPN Ricci who observed a decreased range of motion

in the left ankle, bruising, moderate edema, and no deformity. (DSOF ¶ 22, Barcklay-Dodson Aff. ¶ 17.) Defendant was not on site, so the nurse called Defendant and described her observations. (Id.) Defendant ordered x-rays of the left ankle, which were done that day. (Id.) Defendant reviewed the x-rays that day and noted no fractures or dislocations. (Id.)

As to Plaintiff's claim that he should have been seen no later than March 2nd, Defendant attests that she would not necessarily have known if an appointment was cancelled, but it is irrelevant because medical staff had already wrapped the ankle to immobilize it, and Plaintiff was seen on March 3rd. (DSOF ¶ 23, Barcklay-Dodson Aff. ¶ 18.) On March 8th, Plaintiff was moved to the detention unit and on March 11th, Defendant noted that Plaintiff did not need crutches in detention because of limitations on his movement and for policy related reasons. (DSOF ¶ 24, Barcklay-Dodson Aff. ¶ 19.) Defendant saw Plaintiff on March 15th, and he reported that his left ankle sprain was improving; Defendant discussed the dangers of not allowing time to heal and the importance of exercises to strengthen the ankle, as well as the need for Plaintiff to contact medical when he was released from detention to the yard in order to have ankle braces issued. (DSOF ¶ 25, Barcklay-Dodson Aff. ¶ 20.) Plaintiff was moved to another unit on March 27th, and Defendant had no further contact with him. (DSOF ¶ 26, Barcklay-Dodson Aff. ¶ 21.)

Defendant disputes that Plaintiff had a third-degree sprain and nerve damage and instead contends that Plaintiff had minor sprains that did not require MRIs or surgery. (DSOF ¶ 27, Barcklay-Dodson Aff. ¶ 22.) Defendant denies telling Plaintiff that he needed surgery but that ADC could not afford it. (Id.)

## 2.    Plaintiff's Contentions

Plaintiff asserts that his ankle was deliberately injured by another inmate during a basketball game. (Doc. #95, Ex. 1, Pl. Decl. ¶ 6.) Plaintiff refused to be transported to the hospital; although his reason is confusing, it relates to his label as a snitch. (Id. ¶ 5.) His ankle was x-rayed on February 15th, and he asked the radiologist if it would show soft tissue damage; Plaintiff asserts that the radiologist replied that it would not. (Id. ¶ 6.) Plaintiff attests that he saw Defendant on February 17th and she stated that due to tenderness, swelling

and pain, Plaintiff had a third-degree ankle sprain, which occurs when the outer ligaments
are stretched beyond their limits.  (Id. ¶ 7.)  Plaintiff asserts that Defendant said that Plaintiff
probably had a single torn ligament.  (Id.)  When Plaintiff asked for medical shoes and ankle
supports, Defendant allegedly said that the budget was "too tight."  (Id.)

Plaintiff attests that he was assaulted in the shower on February 26th and injured his
left ankle.  (Id. ¶ 8.)  He was not seen by Defendant until 16 days later, and he endured
extreme pain.  (Id. ¶ 9.)  He asserts that he saw Defendant on March 15th and she did not look
at either ankle.  (Id. ¶ 10.)  He told Defendant that the ibuprofen was not working and hurt
his stomach; he asked for naproxen, but Defendant refused.  (Id.)  She also refused his
requests for ankle supports.  (Id.)  He also claims that he was not given a lower bunk order
renewal.  (Id.)  He attests that all three degrees of ankle sprains are the same regarding their
initial treatment but vary in the extended treatment, diagnosis, and pain and states "all noted
in my chart."  (Id. ¶ 12.)  He attests that the only reason he saw Defendant was that he was
grieving his treatment.  (Id. ¶ 13.)  Plaintiff asserts that he has suffered permanent injury.  (Id.
¶ 29.)

In her reply, Defendant argues, among other things, that Plaintiff has not established
that his condition required medical shoes and ankle supports or that Defendant breached the
acceptable standard of care.  (Doc. #97 at 6.)

**3.    Analysis**

Defendant provides evidence that she and other ADC health employees provided
treatment to Plaintiff for his sprained ankles.  Specifically, Defendant offers evidence
showing that Plaintiff was seen immediately following each sprain; x-rays were taken and
read; it was determined that Plaintiff had no broken bones; and Plaintiff was given pain
medication, crutches, ace bandages, ice treatments, and an SNO to limit his activities.
Defendant met with Plaintiff on February 17th  two days after the first sprain; Defendant
increased Plaintiff's pain medication and discussed the importance of range-of-motion
exercises.  Defendant ordered an x-ray on the second ankle on the day that she was advised
of the injury, and she saw Plaintiff about that injury on March 15th, advising him to contact

1   medical when he was released from detention so that he could have ankle braces.

2       Plaintiff argues that Defendant was deliberately indifferent to his medical needs

3   because (1) Defendant refused to arrange for an MRI, (2) Defendant refused to order medical

4   shoes and supports, (3) there was a 16-day delay in seeing Plaintiff regarding his February

5   26th ankle injury, (4) Defendant did not look at his ankle when she saw him on March 15th,

6   (5) Defendant refused to change Plaintiff's pain medication, (6) Plaintiff was not given a

7   lower bunk assignment, and (7) Defendant refused to order ankle supports on March 15th.

8       Plaintiff argues that it is "hotly disputed" whether Defendant met the standard of care.

9   (Doc. #95 at 3.)  But Plaintiff offers insufficient evidence that the treatment provided was

10  medically unacceptable.  See Jackson, 90 F.3d at 332 (to prevail on a deliberate-indifference

11  medical claim, plaintiff must show that the treatment was medically unacceptable.)  Plaintiff

12  offers no admissible evidence that an MRI was medically necessary, even assuming that

13  Defendant told him that he had a third-degree ankle sprain and probably a torn ligament.

14  Plaintiff argues that Defendant noted "degenerative changes," but he provides no admissible

15  evidence that degenerative changes would require a different course of treatment than that

16  provided by Defendant.  (Doc. #95 at 14.)  Plaintiff's asserts that degrees of sprains vary in

17  treatment and diagnosis, but this is vague, and Plaintiff is not competent to offer medical

18  testimony, see Fed. R. Civ. P. 56(e).  Plaintiff's reference to his medical chart —"all noted

19  in my chart"—contains no specific cite.  Likewise, Plaintiff offers no evidence that medical

20  shoes or an ankle brace were medically necessary.  Differences in judgment between an

21  inmate and prison medical personnel regarding an appropriate diagnosis or treatment are not

22  enough to establish a deliberate-indifference claim.  Jackson, 90 F.3d at 332.

23      Plaintiff claims that Defendant waited 16 days to see him regarding his February 27th

24  injury.  But it is undisputed that Plaintiff was seen by a nurse on the day of the injury and

25  received treatment—a wrap bandage, medical ice, and pain medication, as well as a SNO

26  limiting his activities.   It is also undisputed that Plaintiff was seen by a nurse on March 3rd

27  and that his ankle was wrapped and immobilized.  Plaintiff argues that Defendant does not

28  claim that *she* wrapped the ankle or ordered it wrapped.  (Doc. #93 at 13.)  But there is no

1   constitutional requirement that Defendant personally perform these tasks. It is also

2   undisputed that Defendant ordered x-rays of the ankle on the day that she was notified of the

3   injury and determined that the ankle was not broken. Plaintiff does not claim that he

4   submitted an HNR regarding pain or offer proof that Defendant knew that Plaintiff was in

5   pain during the 16-day period and ignored it.  Plaintiff offers no evidence that the "delay"

6   in seeing him was medically unreasonable under the circumstances.  See Jackson, 90 F.3d

7   at 332. Similarly, Plaintiff complains that Defendant did not change his medication to

8   naproxen, but it is undisputed that she prescribed pain medication, and Plaintiff offers no

9   evidence that naproxen was medically appropriate.  See id.

10          Plaintiff also argues that on March 15th Defendant did not order ankle braces and that

11   she did not look at his ankle.  But Plaintiff does not dispute that Defendant told him to

12   contact medical after he was released from detention so that he could have ankle braces

13   issued.  Plaintiff argues that Defendant Buffington provided him with ankle braces when he

14   was in lockdown, and there is no policy prohibiting ankle braces in detention.  (Pl. Decl. ¶

15   11.)  But even if Defendant was mistaken that ankle braces were not permitted in detention,

16   there is no evidence that she was deliberately indifferent.  And the medical record for March

17   15th, which Plaintiff submits with his response, notes that Defendant discussed Plaintiff's

18   condition and observed him walking.  Plaintiff's allegations, even if true, do not establish

19   deliberate indifference.  See Jackson, 90 F.3d at332.  Although Plaintiff alleges difficulty

20   walking and an inability to stand for long periods, he provides no medical evidence linking

21   this alleged harm to Defendant's conduct.  See Rizzo v. Goode, 423 U.S. 362, 371-72, 377

22   (1976) (to state a valid claim under § 1983, plaintiffs must allege that they suffered a specific

23   injury as a result of specific conduct of a defendant and show an affirmative link between the

24   injury and the conduct of that defendant).

25          Plaintiff's only evidence in support of his claim of deliberate indifference is that

26   Defendant allegedly said that the budget is "too tight" for ankle braces and that Defendant

27   did not order a lower bunk for Plaintiff.  While it is not clear why Defendant did not order

28   a lower bunk, the Court finds that, in light of Defendant's undisputed evidence regarding the

1    treatment for Plaintiff's sprained ankles, Plaintiff's evidence is insufficiently probative to

2    create a genuine dispute regarding whether Defendant's conduct was deliberately indifferent.

3    See Anderson, 477 U.S. at 249 (there is no issue for trial unless there is sufficient evidence

4    in favor of the non-moving party for a jury to return a verdict for that party).  Accordingly,

5    the Court grants summary judgment on this claim.

6       **B.**  **Buffington**

7       **1.**  **Defendant's Contentions**

8       In support of the motion, Buffington submits her Affidavit and an excerpt from the

9    Merck Manual of Diagnosis and Therapy.  (Doc. #92, Ex. A, Buffington Aff., Ex. 1, Merck

10   Manual.)  Defendant has been employed as a Nurse Practitioner or Mid-Level provider by

11   ADC from 1998 to the present.  (Buffington Aff. ¶ 1.)  She attests that on June 21, 2005, she

12   saw Plaintiff for a follow-up visit regarding a lump in his throat.  (DSOF ¶ 31, Buffington

13   Aff. ¶ 9.)  During that visit, Plaintiff said that his face was numb, his left arm tingling, he had

14   lost his sense of smell, he could not close his left eye, and he could not chew or swallow.

15   (Id.)  The left side of his face was drooping, his left eye did not close, and his grip strength

16   was unequal.  (Id.)  Based on the reported symptoms, Defendant determined Plaintiff was

17   probably suffering from Bell's palsy or the after-effects of a stroke.  (Id.)  Defendant attests

18   that she observed Plaintiff's behavior and demeanor during his visit and reviewed the Merck

19   Manual to confirm her initial assessment and course of treatment. (DSOF ¶ 32, Buffington

20   Aff. ¶ 10.)  Because localized symptoms were not typical of a stroke—including lack of

21   difficulty speaking or ambulating—Defendant concluded that Plaintiff was most likely

22   having an episode of Bell's palsy.  (Id.)  Defendant ordered an MRI, an x-ray series of

23   Plaintiff's skull and cervical spine, and lab tests.  (Id.)  Defendant prescribed prednisone; she

24   did not consider Acyclovir or Famotidine, which were not appropriate in her judgment.

25   (DSOF  ¶ 33, Buffington Aff. ¶ 11.)  She provided Plaintiff with an eye patch and

26   recommend the use of eye drops in the affected eye for the next three weeks.  (DSOF ¶ 33,

27   Buffington Aff. ¶ 12.)

28      Defendant reviewed Plaintiff's x-rays and determined that the skull series was within

1    normal limits.  (DSOF ¶ 34, Buffington Aff.  ¶ 13.)  She was waiting for a report on the

2    MRI, which she did not try to expedite because she did not consider it urgent.  (Id.)

3    Although she had requested the MRI, it still had to be approved and then scheduled by the

4    clinical Coordinator with the Yuma Diagnostic Imaging Center. (Id.) Defendant attests that

5    an MRI is not typically scheduled and conducted until after x-rays, which had just been

6    taken. (Id.)  Defendant attests that Plaintiff's records do not contain a HNR relating to his

7    "stroke-like" symptoms between the time he initially sought treatment on June 19th and June

8    25th.  (DSOF  ¶ 36, Buffington Aff.  ¶ 15.)  ADC provides the HNR process to request

9    medical attention, or if, for example, Plaintiff thought his MRI was taking too long.  (Id.)

10          The ADC Medical Review Committee approved Plaintiff's MRI on June 22nd, the day

11   after Defendant ordered it.  (DSOF  ¶ 37, Buffington Aff. ¶ 16.)  A referral was sent to

12   ADC's Health Services Central Office on June 24th, which issued the final approval on July

13   7th.  (Id.)  The MRI was performed on July 22nd.  (Id.)  The report of the MRI indicates

14   various findings and concludes by stating "Unremarkable magnetic resonance imaging study

15   of the brain."  (Id.)  The report of the abdominal x-ray that Plaintiff received at the same

16   time, indicates that it too was normal.  (Id.)

17          On July 21st, Defendant saw Plaintiff regarding complaints of abdominal pains, not

18   the "stroke-like" symptoms.  (DSOF ¶ 39, Buffington Aff. ¶ 18.)  Defendant did not think

19   that the pain was associated with the predinsone but rather resulted from adhesions around

20   the site of a prior appendectomy for which Plaintiff had been treated beginning in May 2005.

21   (Id.)  To confirm her assessment, Defendant requested a second opinion from Dr. Sheetz and

22   ordered additional lab work to rule out a bacterial infection.  (Id.)  Defendant again saw

23   Plaintiff on August 2nd, and Plaintiff said that he had come for a follow-up on his MRI and

24   x-ray.  (DSOF  ¶ 42, Buffington Aff.  ¶ 20.)  Defendant explained that both studies were

25   negative. (Id.)  Plaintiff said that his abdomen still hurt, as did his ear.  (Id.)  Defendant

26   examined Plaintiff and determined that he was neurologically intact, and she prescribed

27   medication for the ear, scheduled him for an ear evaluation, and reminded him to submit an

28   HNR if other issues arose.  (Id.)

1    During the time that she was treating him, Defendant did not think that Plaintiff was

2    suffering from Ramsey Hunt Syndrome (RHS), primarily because he did not have herpes

3    zoster signs (blistering) along his nerve pathways. (DSOF ¶ 42, Buffington Aff. ¶ 21.)  His

4    symptoms were most consistent with a diagnosis of Bell's palsy.  (Id.)  Defendant last saw

5    Plaintiff on August 18th, when Plaintiff sought care for his ear pain. (DSOF ¶ 43, Buffington

6    Aff. ¶ 22-3.)

7        **2.    Plaintiff's Contentions**

8        Plaintiff asserts that he was seen by Defendant on June 21st because of an HNR he

9    filed days earlier about a cyst in his mouth and enlarged lymph nodes. (Pl. Decl.  ¶ 17.)  By

10   the time that he saw Defendant, Plaintiff had loss of hearing, strength, and vision; diminished

11   facial functions; headaches, earaches, nausea, dizziness, and pain; and an inability to speak,

12   eat drink, or close his left eye.  (Id.)  Plaintiff alleges that he was led to believe Defendant

13   was a doctor. (DSOF ¶ 18.)  Defendant told Plaintiff that he had Bells' palsy.  (Id.)  Plaintiff

14   attests that Defendant did no testing, ignored the symptoms, prescribed medication without

15   ruling out other possibilities, and did not check any medical manual.  (Id.)  He alleges that

16   she "failed to realize" the pain, dizziness, blisters, swollen lymph nodes, and hearing loss.

17   (Id.)  Plaintiff asserts that these are not usual symptoms of Bell's palsy.  (Id.) He asserts that

18   he heard Defendant and an officer discussing having gone to a bar the night before and that

19   Plaintiff could smell "the unmistakable odor of alcohol emanating from" Defendant. (DSOF

20   ¶ 25.)

21       Plaintiff asserts that during the following weeks, he complained about the symptoms

22   and grieved the delay in diagnosis and treatment.  (Id. ¶ 19.)  He attests that Defendant

23   refused to alter her course of treatment and continued with prednisone despite Plaintiff's

24   complaints of abdominal pain.  (Id.)  Defendant continued to say Plaintiff had Bell's palsy,

25   even though symptoms pointed to something else.  (Id.)  Plaintiff asked for a doctor, and

26   Defendant said no.  (Id.)

27       Plaintiff attests that he contacted his mother, who then contacted neurologists and ear,

28   nose, and throat specialists, who all directed her to "the facial nerve 2nd editions." (Id. ¶ 20.)

1   Plaintiff asserts that "these fact sheets are the most widely accepted courses of treatment and
2   information available on facial nerve paralysis, and are referred to by all doctors in this field
3   of medicine." (Id.)  From these fact sheets, Plaintiff learned that his symptoms pointed to
4   RHS, "which mimics [b]ell's palsy and is easily overlooked." (Id.)

5          Plaintiff asserts that facial paralysis results from nerve damage, and the first priority
6   in treatment is to eliminate the source of the damage, because as time goes on, constant or
7   increasing pressure can increase damage to the nerve. (Id. ¶ 22.)  Plaintiff asserts that
8   prednisone did nothing to eliminate the cause of the inflammation, which is viral. (Id.)  The
9   virus that causes Bell's palsy is unknown, but RHS is caused by reactivation of the varicella
10  Zoster virus and is treated with acyclovir. (Id.) Plaintiff alleges that Defendant allowed the
11  virus to remain unchecked, which caused it to compress his 7th and 8th nerves, resulting in
12  painful recurrences. (Id.)

13         Plaintiff asserts that he had a recurrence on September 25th; Plaintiff saw an ADC
14  doctor who prescribed anti-virals. (Id.  ¶ 23.)  Plaintiff alleges that by this time it was too
15  late, that as a result he has recurrences every three to six months. (Id.)  Plaintiff claims that
16  if Defendant had not dismissed his claims as purely psychological, then he would not have
17  these painful chronic conditions. (Id. ¶ 24.)  He further argues that the Merck Manual states
18  that prednisone is only effective if given in the first 24 to 48 hours. (Id.)  Plaintiff asserts that
19  he was referred to an ear, nose, and throat specialist on September 7, 2007, which shows that
20  such a referral could have been made by Defendant. (Id. ¶ 30.)

21         Plaintiff also files a Notice of Change in Circumstances in which he alleges that he
22  underwent surgery on February 1, 2008, to restore his sense of taste and smell. (Doc. # 104.)
23  He alleges that he lost these senses as a result of Defendant's inadequate medical care. (Id.)
24  He also asserts that he complained of continuous prolonged pain and blisters, which are
25  symptoms of RHS, but that Defendant tried to diagnose a separate medical condition. (Id.)
26  He now claims that he asked to see a specialist. (Id.)

27         In the reply, Defendant argues that Plaintiff has not established a proper foundation
28  for his lay opinion that he suffers from RHS or that Defendant did not treat his condition

1   appropriately.  (Doc. #97 at 6.)

2       **3.     Analysis**

3       Defendants are correct that Plaintiff offers no admissible medical evidence that he in

4   fact suffers from RHS.  But Defendants do not dispute that he has the condition, and Plaintiff

5   submits documents from ADC regarding a recurrence of his RHS.  (Doc. #95, Ex. 25.)  As

6   such, the Court will assume for purposes of this motion that Plaintiff has RHS.

7       Defendant provides evidence that she saw Plaintiff and believed, based on his

8   symptoms and her referral to the Merck Manual, that he had Bell's palsy and thus she treated

9   him with prednisone, recommended eye drops, and provided him with an eye patch.  The

10  Merck Manual indicates that prednisone may reduce paralysis and expedite recovery, and

11  that it is important that steps be taken to prevent corneal drying; steps include eye drops and

12  eye patches.  She also offers evidence that she ordered an MRI, various x-rays, and lab tests,

13  which the Merck Manual indicates are appropriate when the diagnosis is in doubt.  She saw

14  Plaintiff again about a month later regarding his stomach pain, which she did not consider

15  to be related to the stroke-like symptoms, but rather recurring abdominal problems.  She also

16  saw Plaintiff on August 2nd and 18th  regarding his stomach pain.

17      To prevail on a claim of deliberate indifference to a serious medical need, a plaintiff

18  must show that the prison official both knew of and disregarded an excessive risk to inmate

19  health; the official must both be aware of facts from which the inference could be drawn that

20  a substantial risk of serious harm exists, and she must also draw the inference.  <u>Farmer</u>, 511

21  U.S. at 837.  Plaintiff has not met his burden to provide admissible evidence from which a

22  jury could infer that Defendant acted with deliberate indifference.

23      Plaintiff alleges that on the first day that he presented with his stroke-like symptoms,

24  Defendant did no testing and prescribed medication without ruling out other possibilities.

25  But Plaintiff offers no evidence regarding what testing Defendant could have conducted on

26  that first day.  He does not dispute that she ordered an MRI, x-rays, and lab tests.  His

27  allegation that she "failed to realize" pain, dizziness, blisters and other symptoms does not

28  support a claim of deliberate indifference.  He does not claim, much less prove, that the

1   prednisone harmed him.  Defendant attests, based on her personal knowledge, that she

2   consulted the Merck Manual, which confirmed her initial assessment of Bell's palsy.

3   Although Plaintiff claims that Defendant did not consult the Manual, he does not state

4   anything to indicate that he has personal knowledge of that fact.

5       Plaintiff alleges that Defendant refused to change her diagnosis and continued her

6   course of treatment with prednisone despite his complaints of abdominal pain.[1]  He asserts

7   that after his June appointment, he complained about the symptoms and grieved the delay in

8   diagnosis.  But there is no evidence that Defendant knew of his complaints of pain other than

9   what Plaintiff told her when she treated him.  Defendant asserts that she believed the

10  abdominal pain was related to other medical problems and that she requested a second

11  opinion from a doctor and ordered additional tests.   Plaintiff does not dispute that he had

12  other medical problems relating to his stomach or claim that Defendant did not consult with

13  a doctor or order testing.

14      Plaintiff is not competent to attest to the medical evidence in his Declaration.  He has

15  attached numerous pages of medical literature regarding facial paralysis, Bell's palsy, and

16  RHS that appear to be internet printouts; Defendant argues that these are inadmissible

17  hearsay.  (Doc. #97 at 7.)  The Court notes that even if it were to consider these documents,

18  they do not support a finding of deliberate indifference.  Plaintiff's Example 20 states

19  "Ramsey Hunt Syndrome results in symptoms that are in many respects identical to Bell's

20  palsy.  The symptoms are so alike that a diagnosis of Ramsey Hunt Syndrome can easily be

21  missed." (Doc. # 95, Ex. 20.)  Plaintiff's Example 21 notes that the window of opportunity

22  to treat Bell's palsy with prednisone is seven days.  (Id., Ex. 21 at 1.)  This evidence suggests

23  that a misdiagnosis of Bell's palsy and administering prednisone would not be medically

24  unreasonable.

25      Plaintiff offers no evidence to support an inference that Defendant had, in fact,

26

27      [1]Plaintiff asserts for the first time in his Notice of Change of Circumstances that he
28  complained of blisters.  Because the evidence is not sworn to and is untimely, the Court will
    not consider it.

1  concluded that Plaintiff suffered from anything other than Bell's palsy.  A mis-diagnosis is

2  not deliberate indifference.  Even if a jury were to believe Plaintiff's assertion that Defendant

3  had alcohol on her breath when she first saw Plaintiff regarding this matter or that Defendant

4  denied a request to be seen by a doctor, that would at most be evidence of negligence or gross

5  negligence.  But inadequate treatment due to malpractice or gross negligence does not

6  constitute an Eighth Amendment violation.  Wood, 900 F.2d at 1334.  Finally, Plaintiff offers

7  no admissible evidence to show that a delay in diagnosis or anti-viral treatment, rather than

8  the condition itself, resulted in harm to Plaintiff.  See Rizzo, 423 U.S. at 371-72, 377.

9  Accordingly, the Court grants summary judgment on this claim.

10         Because the Court grants summary judgment on the grounds discussed above, it need

11  not consider Defendants' other arguments.  There are no claims remaining, and the Court will

12  dismiss the action.

13  **IT IS ORDERED:**

14         (1)     Defendants' request to strike Plaintiff's response (contained in Defendants'

15  reply Doc. #97) is **denied**.

16         (2)     Plaintiff's Motion to Strike Defendants' Reply (Doc. #98) is **denied**.

17         (3)     Defendants' Motion for Summary Judgment (Doc. #91) is **granted**.

18         (4)     The action is dismissed, and the Clerk of Court must enter judgment

19  accordingly.

20         DATED this 26th day of June, 2008.

21

22

23                                    _____

24                                    Mary H. Murgula
                                      United States District Judge

25

26

27

28